UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

HUI LIN, PIN YUN ZHANG, WEN MING
LIN, HUANG CHEN, AI YI LIN, and YU
JIAO LIN,

**MEMORANDUM & ORDER**

**08-cv-4778 (NGG) (RLM)**

Plaintiffs,

-against-

GREAT ROSE FASHION, INC., SILVER
FASHION, INC., GREAT WALL CORP.,
PING NEN LIN, XIAO YAN LIN, and
FANG ZHEN,

Defendants.
------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

In this Fair Labor Standards Act ("FLSA") case, Plaintiffs Hui Lin, Pin Yun Zhang, Wen

Ming Lin, Huang Chen, Ai Yi Lin, and Yu Jiao Lin ("Plaintiffs") allege that they were deprived

of a minimum wage and overtime pay while working in a garment factory, and ultimately

discharged from their employment in retaliation for pursuing their rights to this compensation.

(Docket Entry #9, Amended Complaint ("Am. Compl.").)  In connection with their retaliatory

discharge claim, Plaintiffs moved for immediate injunctive relief reinstating each of them to their

former positions.  (See Docket Entry #16, Order to Show Cause.)

On January 7, 2009, the court denied Plaintiffs' motion for a temporary restraining order

("TRO") reinstating them to their prior employment, but scheduled a hearing to consider a

preliminary injunction.  (Id.)  The court issued a limited TRO prohibiting Defendants Great Rose

Fashion, Inc., Silver Fashion, Inc., Great Wall Corp., Ping Nen Lin, Xiao Yan Lin, and Fang

Zhen ("Defendants") from engaging in any future retaliatory conduct, including the closing or

suspension of operations of Defendants' businesses located at 47-23 36th Street, 47-22 36th

1

Street, and/or 47-27 36th Street, Long Island City, New York, to the extent they were in operation at the opening of business on January 7, 2009.  (Id.)  The court further enjoined the Defendants from removing any equipment allegedly owned by Defendant Silver Fashion, Inc. from the premises of its current location, or entering into a contract of sale or otherwise disposing of such equipment, absent further order from the court.  (See id.; Docket Entry #20, Order dated January 20, 2009 (extending TRO pending decision of the court on further injunctive relief).)

The court held an evidentiary hearing on January 13 and 15, 2009 (the "Hearing") in order to evaluate Plaintiffs' Motion for a Preliminary Injunction, and sought post-hearing briefing by the parties.  (See Docket Entry #20 (setting briefing schedule); Docket Entry #24, Plaintiffs' Post-Hearing Memorandum in Support ("Pl. Post-Hearing Mot.")).  Defendants opposed the Plaintiffs' Motion, and cross-moved to dismiss on the ground that Plaintiffs lack standing to sue under the FLSA.  (Docket Entry #29, Defendants' Post-Hearing Memorandum in Opposition ("Def. Post-Hearing Opp.").)

For the reasons set forth below, Defendants' Motion to Dismiss the action for lack of standing is DENIED.  Plaintiffs' Motion for a Preliminary Injunction seeking reinstatement is also DENIED.

### I.    BACKGROUND

Plaintiffs worked in a garment factory located at 47-27 36th Street in Long Island City, New York (the "Factory"), from approximately November 2005 until January 5, 2009.  (Tr. 31, 33, 78-79.)  Plaintiffs Huang Chen, Ai Yi Lin, Hui Lin, Wen Ming Lin, and Pin Yun Zhang served as "packers" at the Factory (the "Packer Plaintiffs"); Plaintiff Yu Jiao Lin served as a "thread cutter."  (Tr. 70-71, 79.)  Defendants Ping Nen Lin ("Mr. Lin") and Xiao Yan Lin ("Mrs.

Lin") are a married couple (collectively, "the Lins"). The Lins owned and managed the Factory through some combination of the defendant corporations – Great Rose Fashion, Inc. ("Great Rose"), Silver Fashion, Inc. ("Silver Fashion"), and Great Wall Corporation ("Great Wall") (collectively, the "Defendant Corporations") – each of which was located in the same building at 47-27 36th Street, Long Island City, and owned, operated, and controlled by either the Lins or Mrs. Lin's parents, who reside in China. (Tr. 158-59, 104, 191, 237, 241-42, 251.) Through one or more of these entities, Defendant Fang Zhen was employed by the Lins to oversee "quality control" at the Factory. (Tr. 179.)

Plaintiffs filed this action on November 25, 2008, claiming they were deprived of a minimum wage and overtime pay in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and New York Labor Law while working at the Factory. (Docket Entry #1, Complaint ("Compl.")) The Lins were served on December 17, 2008, and Fang Zhen was served the next day. (Tr. 84-85, 90-91; Docket Entries #2-7, Executed Summons.) Plaintiffs allege that immediately following receipt of the complaint, Defendants engaged in a series of adverse employment actions, such as reducing Plaintiffs' hours, altering their form of payment, and harassing Plaintiffs and other workers about the suit. (Am. Compl. ¶¶ 50-58.) The pattern allegedly culminated in the dismissal of Plaintiffs from their jobs on January 5, 2009. (Id. ¶ 54.) Plaintiffs amended their complaint to include retaliation claims under 29 U.S.C. § 215(a)(3) and New York Labor Law § 215, and moved the court for a temporary restraining order (TRO) seeking reinstatement on the basis of these retaliation claims. (See id. ¶¶ 91-100; Order to Show Cause.)

Defendants claim that Plaintiffs were dismissed solely because economic conditions forced the Factory to go out of business. (Def. Post-Hearing Opp. 1; Tr. 219.) Plaintiffs assert

that this is a pretext for Defendants' retaliatory actions and that the Factory remains in operation. Further, Defendants argue that Plaintiffs lack standing under the FLSA and New York Labor Law because they served as "independent contractors" rather than employees of the Factory, and therefore are not entitled to the protections provided by those statutes. Defendants also argue that none of the named Defendants is subject to liability because they do not qualify as the "employers" of these Plaintiffs under the FLSA and New York Labor Law.

## II.     FINDINGS OF FACT

The following findings of fact are drawn from the evidence presented at the Hearing. The court prefaces its findings with a few comments about these unusual proceedings. All of the witnesses testified through the aid of court-certified Chinese language interpreters, retained by counsel. Three of the Plaintiffs speak only the Fujianese dialect; the remaining three plaintiffs speak both Fujianese and Mandarin. (Tr. 10.) The Defendants are Mandarin speakers. (Tr. 10.) Despite competent interpretation, the Hearing was plagued with obstacles that went beyond the challenges of translation and cross-cultural understanding. Some witnesses obstructed the process by providing evasive and dishonest testimony, an issue discussed further below. Other witnesses were not adequately prepared for testimony by their counsel. Inexperienced and unprepared counsel often faltered through unfocused and inappropriate questioning, for example, failing to lay basic foundations for evidence or follow rudimentary courtroom procedure, neglecting to elicit factual detail, and aggressively leading witnesses on direct examination.[1] The

---

[1] My intent in recording these observations is not merely to admonish the parties and their counsel. The rules of trial procedure are more than an exercise in formalism; they are designed to ensure the substantive integrity of the process and to elicit reliable evidence. See, e.g., Tr. 24 (informing Plaintiffs that video needed to be authenticated and offered into evidence, not simply shown in court); id. 146 (directing parties to properly identify and offer evidence); id. 221-222 (explaining that foundation is "normally" laid for evidence, and providing the requisite questions for business records); id. 215 (admonishing Defendants for failure to ask witness to identify basic facts about exhibit for the record); id. 129, Testimony of Fang Zhen (The Court: "Wait. I can't let that sit on the record. It's totally confusing."); id. 116-119 (court intervening to question Fang Zhen); id. 40-42 (court intervening to question Wen Ming Lin); id. 219, Direct Testimony of Mrs. Lin (Q: "Did you close the factory in retaliation for a

4

court frequently intervened to examine witnesses and clarify witness testimony in order to maintain the integrity of the proceedings.  The court's role, however, is limited to the administration of justice, and does not extend to performing the functions of counsel for any party.  As a result of these difficulties, some factual issues could not be resolved at the Hearing. These circumstances are noted in the findings set forth below where necessary.

A.  Defendants' Corporate Structure

The Factory was located on the second floor of a brick building at 47-27 36th Street, Long Island City (the "36th Street Building").  (Tr. 104.)  Various companies owned by Defendants and their relatives operate from the 36th Street Building.  The exterior is marked "Great Wall Corporation."  (Tr. 25-26; Pl. Ex. 1.)  The building is owned by a company called "JDA Realty," which in turn is owned by Mrs. Lin.  (Tr. 170.)  JDA Realty rents the building to Great Wall.  (Tr. 170.)  Mrs. Lin's husband is the sole owner of Great Wall.  (Tr. 158, 164, 181.) The parties have not specified the amount of rent, if any, that Mr. Lin's company pays to his wife's company.

Great Wall maintains a warehouse on the first floor of the 36th Street Building, and offices on the third floor.  (Tr. 177, 179, 181.)  Great Wall is a wholesale garment company, which contracts with third-party manufacturers in the United States and China for goods to be resold to retailers.  (Tr. 158.)  Until the end of 2008, Great Wall sublet part of the second floor of the building to another entity, Silver Fashion, at a purported rate of $18,000 a month.  (Tr. 159, 170.)  Silver Fashion was a garment manufacturing company, owned in absentia by Mrs. Lin's parents, who live in China.  (Tr. 159, 241-42, 251.)  Great Wall and Silver Fashion are the 36th

---

lawsuit that's filed against you?"  A: "No."); id. 236, Cross-Examination of Mrs. Lin ("Now, do you know if calling someone an independent contractor makes them an independent contractor?").

Street Building's only occupants.  (Tr. 179.)  In effect, Mr. Lin rented the building from his wife and sublet part of it back to her parents.

The space ostensibly rented to Silver Fashion constituted the Factory.  The remainder of the second floor was occupied by Great Wall's "cutting room."  (Tr. 178.)  Some paper boxes provide the only physical separation between the Great Wall "cutting room" and Silver Fashion's Factory.  (Tr. 178.)  Since Silver Fashion went out of business on December 31, 2008, it is unclear whether the space has been rented to a new tenant.  (See Tr. 182.)  The second floor Factory space has never been rented out to anyone other than Mr. Lin, Mrs. Lin, and Mrs. Lin's parents, or companies controlled by them.  (Tr. 170-171.)

Silver Fashion was not merely a commercial tenant; the business operations of Silver Fashion were closely interwoven with those of Great Wall.  Great Wall was a customer of Silver Fashion, which supplied garments made in its Factory to Great Wall for sale.  (Tr. 171-172.)  In fact, Great Wall was Silver Fashion's only customer.  (Tr. 253.)  Silver Fashion existed for the singular purpose of manufacturing garments for Great Wall.

Silver Fashion was itself the successor to an earlier company, Great Rose Fashion, Inc. ("Great Rose"), which in turn succeeded a company known as Spring Fashion ("Spring Fashion").  (Tr. 241-47.)  Spring Fashion was allegedly closed and re-opened under the auspices of Great Rose pursuant to the advice of an accountant. (Tr. 244.)  Mrs. Lin closed Great Rose and re-opened the business as Silver Fashion around June or July 2008 at the purported request of her parents.  (Tr. 249, 251.)  These companies were virtually identical:  they were under the same ownership (Mrs. Lin's parents) and management (Mrs. Lin), engaged in the same business, used the same equipment, maintained the same staff, and operated out of the same location – the second floor of the 36th Street Building.  (Tr. 241-53.)  The only difference was the company's

6

official name.  All of these companies manufactured goods for sale to a sole client:  Great Wall.  (Tr. 242, 253.)

Defendants argue that Great Wall is an entirely separate business from the Factory.  (Def. Post-Hearing Opp. 10-13.)  They claim that the Factory was solely the enterprise of Silver Fashion and related predecessor entities exclusively owned by Mrs. Lin's parents, who are not parties to this suit.  (Id. 8-19.)  They emphasize that Mr. Lin is the sole owner of Great Wall, but is not an owner, officer, or employee of any of the other Defendant Corporations.  (Tr. 158.)  Each of the individual Defendants insisted that they worked purely for Great Wall and denied control over the Factory.  These contentions quickly unraveled in the course of the Hearing.

### 1. Mrs. Lin's Testimony

Mrs. Lin testified that she works for Great Wall.  (Tr. 237.)  Mrs. Lin denied that she was employed by Silver Fashion, conceding only that she "takes care of [her] parents' garment factory for them."  (Tr. 240.)  Mrs. Lin contributes "design and development" work for Great Wall.  (Tr. 238.)  In this capacity, she assesses and modifies the design of sample garments, and makes her own samples based upon garments that she finds in department stores.  (Tr. 239.)  Mrs. Lin did not explain where the garments that she custom-designed for Great Wall were manufactured.

### 2. Fang Zhen's Testimony

Fang Zhen's testimony regarding the Defendants' corporate structure appeared evasive and rehearsed.  Fang Zhen identified herself as "a friend of Mrs. Lin" and testified that she was employed by Great Wall.  (Tr. 104, 116.)  She identified Mr. Lin as her boss.  (Tr. 131.)  She noted that she also served as a "supervisor" and "quality control person" in the Factory "downstairs."  (Tr. 104; 107.)  Fang Zhen has worked at other factories owned by Great Wall

over the years; at one point, the company owned "six to seven factories." (Tr. 104.) Fang Zhen testified that Great Wall has maintained one factory for the past two years.[2] (Tr. 104.) She denied working for any other company, but stated alternately that "I only work for Mrs. Lin, I only help Mrs. Lin." (Tr. 107-108.)

Fang Zhen could not identify which corporation issued her paychecks at first, but later stated that Mr. Lin paid her wages. (Tr. 108, 132.) She said she had only learned of Silver Fashion in the summer of 2008, and had never heard of Great Rose Fashion or Spring Fashion. (Tr. 107-108.) However, she claimed "I realized that our company and the factory, there's distinction between the two" because the second floor Factory was rented out to Silver Fashion. (Tr. 108-09.) Fang Zhen later elaborated that "Great Wall Corporation subcontracted the garments to Silver Fashions to manufacture" and that, as part of her duties at Great Wall, she "occasionally went downstairs to check the quality of those garments." (Tr. 132.)

When asked whether Mrs. Lin worked for both Great Wall and Silver Fashion, Fang Zhen responded: "Yes, I know that Mrs. Lin helped her parents." (Tr. 108.) Throughout her testimony, Fang Zhen repeated her refrain: "I only helped Mrs. Lin." (Tr. 117, 131.) She claimed not to know what work Mrs. Lin did at the company, but that Mrs. Lin "occasionally helped her parents run this factory." (Tr. 117, 130.)

### 3.  Mr. Lin's Testimony

Mr. Lin's credibility was repeatedly impeached at the Hearing as he described the nature of his business, Great Wall, and its relationship to the other Defendant Corporations. A few examples are highlighted below.

---

[2] Mr. Lin refuted this statement, claiming that Fang Zhen was "mistaken." (Tr. 166.) He stated that "we used to have [] five or six factories as our processing factories," but claimed he did not own any of these factories and did not know the name of any person or entity that did. (Tr. 166.) In light of Mr. Lin's impeachment, the court does not credit this self-serving, unsupported testimony. (See supra Section II.B.3.)

Plaintiffs confronted Mr. Lin with information published on Great Wall's website.  (Tr. 165; Pl. Ex. 4.)  Mr. Lin testified that Great Wall employed only 22 people, although the website stated that the company had 120 employees.  (Tr. 165.)  Confronted with the discrepancy, Mr. Lin denied that Great Wall had ever employed that many workers and stated that he had misrepresented the figure on the website as an "advertisement" for the company.  (Tr. 165.)  The website further stated that "Great Wall owns and operates four sewing factories in Long Island City."  (Tr. 166.)  Mr. Lin declared that this was untrue, and that he had posted this misrepresentation on the website "[b]ecause of the website was only a tool as an advertisement for the company and I listed those factories who processed my garments as my own."  (Tr. 167.)  This line of questioning offered only three possible conclusions:  that Mr. Lin had affirmatively misrepresented his business operations in the past, that he lied at the Hearing in an attempt to insulate himself from liability, or that he has engaged in multiple acts of deceit and dishonesty.

Later in his testimony, Mr. Lin claimed that while Great Wall was Silver Fashion's only customer, Silver Fashion supplied only 3-4% of Great Wall's inventory.  (Tr. 172.)  Mr. Lin asserted that the remainder of his inventory was manufactured by other factories, and mostly imported from China.  (Tr. 173.)  When questioned directly and extensively by the court, Mr. Lin could not identify a single supplier to his wholesale business other than Silver Fashion.  (Tr. 182-187 (Q:  "Do you know any of the names of these companies?"  A:  "I'm not very familiar with that…").)  He alleged that he received invoices from a variety of supplier companies, and personally signed the checks to pay these invoices, but that he did not know the identities of the payees.  (Tr. 186-87.)  In effect, Mr. Lin testified that he was the sole owner and officer of a wholesale company, whose entire business consisted of purchasing goods from manufacturers

and reselling those goods, but that he did not know the name or location of <u>any</u> of these alleged suppliers or any persons affiliated with them.

At sidebar, the court told counsel that Mr. Lin had lied to the court.  (Tr. 188 ("You got a client who is lying to the court as far as I'm concerned . . . . There is no possibility that this individual who runs a company which he owns himself doesn't know the companies with which he's doing business, particularly when he signs the checks that go out before they go out."), 190 ("He said he takes the invoices, he signs the checks, and he doesn't know any of the payees to whom he sends the money in a small business that he's been in for four years.  It's not credible, sir.").  The court concluded that "his testimony . . . deserves absolutely no consideration based on the fact that he can't tell me a single company with which he does business."  (Tr. 189.) Consistent with this determination issued at the Hearing, Mr. Lin's testimony as to the separation of his business from the Factory allegedly maintained by Silver Fashion is not entitled to any weight in this decision.  Mr. Lin's incredible testimony only adds to the mounting evidence of Defendants' deceptive business and employment practices.

B.  <u>Plaintiffs' Employment Relationship with the Factory</u>

Plaintiffs Yu Jiao Lin and Wen Ming Lin identified the 36th Street Building as their place of employment over the past three years, but neither knew the name of the company that had employed them.[3]   (Tr. 31, 95.) They explained that the Factory contains different "departments" for sewing, packing, and perhaps other operations, and that the sewing department was located in the back.  (Tr. 48-49.)  Wen Ming Lin testified that he understood the Factory to be the

---

[3] The constant changes in the company's name (from Spring Fashion to Great Rose to Silver Fashion, at a minimum) may have added to this confusion.  Moreover, Yu Jiao Lin further explained that she was illiterate.  (Tr. 95 ("I am illiterate.  I don't know [the name].  I only know it is located on 36th Street and 47th Avenue.").)  As a result, she could not have been expected to understand any signs on the building or the company name on her paycheck.

10

enterprise of a single company, and that the same individuals – including Mrs. Lin and Fang Zhen – oversaw all of the departments.  (Tr. 49.)

     1.  <u>Hiring</u>

Plaintiff Wen Ming Lin testified that he was hired to work at the Factory by Fang Zhen and "the Boss Lady," whom he identified in the courtroom as Mrs. Lin.  (Tr. 31.)  Wen Ming Lin testified that he never hired anyone to work at the Factory.  (Tr. 35-36.)  At some point in time, Mrs. Lin told him she needed additional workers and asked him to find people to fill the positions.  (Tr. 52-53.)  He made some phone calls and brought in three or four candidates for Mrs. Lin to consider.  (Tr. 53.)

Plaintiff Yu Jiao Lin testified that she was referred by a friend who no longer works at the Factory, and Fang Zhen and the "Boss Lady" interviewed her for her position as a "thread cutter."  (Tr. 78-79.)  Yu Jiao Lin testified that only Mrs. Lin and Fang Zhen had the ability to hire and fire workers, and set wages.  (Tr. 80-81.)

At first, Fang Zhen testified that she and Mrs. Lin interviewed the Plaintiffs for their positions at the Factory, but upon objection to the translation of the verb "interview" from defense counsel and restatement of the question, she stated that she did not conduct any interviews.  (Tr. 110.)  Mrs. Lin denied hiring the Plaintiffs.  (Tr. 228.)

     2.  <u>Supervision</u>

According to Wen Ming Lin, Mrs. Lin gave orders to Fang Zhen, who then managed the workers.  (Tr. 33.)  Schedules and other directives were passed down through this chain of command.  (Tr. 33-34.)  Wen Ming Lin testified that he never set anyone's schedule, and never told other employees what work to do there.  (Tr. 35-36.)  Plaintiff Yu Jiao Lin also testified that

Fang Zhen supervised her, checked her work, managed her wages, and disciplined her.  (Tr. 79-80.)

Fang Zhen denied supervising any of the Plaintiffs.  (Tr. 112-113.)  Instead, she claimed that a "Hispanic" man named Jose Ismael supervised the Plaintiffs.  (Tr. 112-116.)  She admitted that this alleged supervisor did not speak Mandarin or any other language that the Plaintiffs could understand, and stated that she "would do some translation."  (Tr. 113.)  She repeatedly described the Plaintiffs as "subcontracting for Mrs. Lin," but failed to describe the functions of these work relationships at the Factory in practical terms.  (Tr. 121.)

Mrs. Lin claimed that Silver Fashion had only twenty employees, categorizing the remainder of the Factory's workers as "contractors."  (Tr. 218.)  The twenty alleged "employees" were never identified by name and none testified at the Hearing.  If a worker arrived late and required discipline, Mrs. Lin would intercede to speak with the worker.  (Tr. 263.)

### 3. Payment of Wages

Wen Ming Lin explained that the workers were each paid via weekly checks, which were usually placed on his desk to make it "easier" for Mrs. Lin.  (Tr. 37, 57.)  Mrs. Lin would sign the paychecks for all the workers, "contractors" included, by using a stamp to imprint her parent's signature.  (Tr. 219.)  Payment by check to each worker continued until December 18, 2008, the day Defendants were served with the Complaint.  (Tr. 37, 39); see Section II.C.3 infra (discussing the alteration of payment on December 18, 2008 in greater detail).

On cross-examination, Defendants inquired whether the Plaintiffs were generally "paid as a unit."  (Tr. 53.)  Wen Ming Lin gave the following response:

> "No, only, only the first time because we only had three of us and then there was a check with my name.  The first week was like that because we only had three of us.  Then we did not have enough people so she

12

> said to get more people.  Then, on the next week, the second week, we
> were paid in cash."

(Id.)  Wen Ming Lin stated that this occurred "the week after December 5th," presumably when he was first hired in 2005.[4]  (Id.)  For some period of time "in the beginning," Wen Ming Lin would sign slips verifying the amount due and quantity of work completed by the Packer Plaintiffs.  (Tr. 53-55, 57; Def. Ex. A.)  Mrs. Lin claimed that she began providing individual checks at the request of Wen Ming Lin, as a courtesy.  (Tr. 264.)

C.  Retaliatory Actions

At the Hearing, Plaintiffs put forth troubling evidence of retaliation.  Testimony illustrated four forms of retaliatory actions by the Defendants:  harassment, reduced hours, changed payment practices, and ultimately, discharge.

1.  Harassment

Plaintiff Yu Jiao Lin testified that Mrs. Lin and Fang Zhen interrogated her about the Complaint on December 16, 2008 – weeks after the Complaint was filed but the day before any Defendant was personally served.  (Tr. 87-88.)  She stated that the two women called her into an office, asking her why she had filed the Complaint and to explain what they had done wrong. (Tr. 87-88.)  Fang Zhen asked her, "Yu Jiao, how did I treat you?"  (Tr. 88.)  The meeting lasted approximately thirty minutes.  (Tr. 88.)  Yu Jiao Lin reported that she felt "nervous" after the meeting and "felt that something was not right."  (Tr. 88.)

Mrs. Lin was served with the Complaint the next day.  (Docket Entry #3, Executed Summons to Xiao Yan Lin.)  On December 18, 2009, Mrs. Lin interrupted the workers to call Yu Jiao Lin forward and announce that Yu Jiao Lin had filed a complaint against her.  (Tr. 89.)  She proceeded to point at Yu Jiao Lin, called her a "heartless person," cursed at her, and declared that

---

[4] Defendants' Exhibit D was a copy of a check dated December 9, 2005 with a memorandum description "Payment for the assigned contractors."  (Tr. 228.)

Yu Jiao Lin "was the one who had caused all this problem." (Tr. 90.)  A surveillance video

submitted by the Defendants shows that this meeting lasted at least ten minutes, and depicts Mrs.

Lin repeatedly and vehemently pointing at Yu Jiao Lin.  (Def. Ex. B(1) at File 2.)  Mrs. Lin

appears visibly angry throughout the meeting.  (Id.)  The copy of the video provided to the court

has no sound.  According to Yu Jiao Lin's testimony, other workers also began berating her,

calling her "heartless" and "troublemaker," and stating that now nobody would continue

working.  (Tr. 90.)  The video shows that after Mrs. Lin finished her speech to the workers, the

workers rushed to convene together, though their discussion cannot be heard.  (Def. Ex. B(1) at

File 2.)  Yu Jiao Lin was sent home early that day, after working a truncated shift of five hours.

(Tr. 91.)

### 2. Reduced Schedules

According to the testimony of plaintiff Weng Ming Lin, the other Plaintiffs were also

dismissed early on December 18.  (Tr. 43.)  Contrary to usual practice, the Plaintiffs were not

given a schedule for the next day's work when they left.  (Tr. 44.)  Another Factory employee,

Chen Si Qiang (whom the other employees referred to as "Master"), instead instructed the

Plaintiffs to wait for a phone call letting them know when they might return to work.  (Tr. 44.)

Wen Ming Lin noticed that only the Plaintiffs, and no other employees, were dismissed early that

day.  (Tr. 43.)  He observed that there was "a lot" of work left to be done in the Factory.  (Tr.

43.)

After these events on December 18, Plaintiffs worked only one more day, December 24,

2009.  (Tr. 35.)  The Plaintiffs worked for limited hours that day as well.  (Tr. 35.)  As he

departed, Wen Ming Lin again noticed that work was left to be done in the Factory.  (Tr. 47.)

Approximately 50-60 employees remained working at the Factory when the Plaintiffs left the premises. (Tr. 46.)

On cross examination, Wen Ming Lin first stated that his hours were reduced in October 2008, and then changed his answer to December 2008. (Tr. 58-62.) Over four pages of testimony, he repeatedly stated he did not understand the questions posed and vacillated between these dates. (Id.) The record remains unclear on this point. Yu Jiao Lin testified that in October 2008, Mrs. Lin called a meeting of the Factory workers and notified them that hours would be reduced because the Factory was under scrutiny from the Labor Department. (Tr. 83-84; 97-98.) After that meeting, the workers' hours were cut back to eight hour days, beginning at 10 a.m. and ending at 6 p.m., and two weeks later, hours were further reduced and schedules were trimmed to just four days a week. (Tr. 98.) Workers also began using punch cards to record their time. (Tr. 85.) Previously, workers would labor at the Factory until midnight, or "until the dawn." (Tr. 99.)

### 3. Changed Payment Practices

On December 18, 2008, the day Defendants were served with the Complaint in this action, the Defendants altered their practice and provided Wen Ming Lin with a larger sum than usual: $1,407.42 rather than the typical $300 he earned weekly.[5] (Tr. 37, 39.) Plaintiffs argue that Defendants did so in an attempt to provide payment for all of the Packer Plaintiffs in a single check made out in Wen Ming Lin's name. (Id. ("they put the whole check in my name"); id. at 41 ("before this time they had written checks for each individual, why would they give me the check in a lump sum"). Wen Ming Lin refused to sign for the check because "it was not the correct amount," and it seemed "like they put it al[1 ]together for me." (Tr. 40.) He testified that

---

[5] Some evidence of Plaintiffs' wage claims was elicited during the Hearing, but this evidence is outside the scope of this Memorandum and Order as they do not form for the basis for the injunctive relief at issue here.

"before this time, they [the Defendants] had written checks for each individual, why would they give me the check in a lump sum?" (Tr. 41.)  The Defendants again attempted to pay the Packer Plaintiffs via a collective check on their last day of work, January 5, 2009, but Wen Ming Lin again refused.  (Tr. 48.)

Plaintiffs' actual evidence of this theory muddled facts with speculation.  Despite extensive questioning by the court, Wen Ming Lin was unable to clarify who gave him this check, and how, if at all, he came to understand why the amount was so much greater than his usual pay.  (Tr. 39-42.)  His testimony failed to explain whether the funds were in fact intended for distribution to other workers.  He stated that he spoke about the check to "the Master and Ms. Fang and they have four people," but that no one told him what to do with the money.  (Tr. 41-42.)

Plaintiffs allege that the Defendants' attempt to pay the Packer Plaintiffs using a single check was yet another form of retaliation.  This incident is better viewed as part of the Defendants' thinly veiled attempts to disavow their employment relationship with the Plaintiffs.

### 4.  Discharge

On December 31, 2008, Fang Zhen contacted Wen Ming Lin and informed him that the Plaintiffs should collect their belongings because the Factory was closing. (Tr. 47.)  Fang Zhen conveyed the same message to Yu Jiao Lin.  (Tr. 92.)  The Plaintiffs went to the Factory for the last time on January 5, 2009 to collect their personal items as directed.  (Tr. 47.)  The entrance they normally used was closed, so they entered through the main door.  (Tr. 47.)  Wen Ming Lin reported that he saw people "hanging up the clothes" that day, but the workers he saw were from the sewing department, not "packers" such as the Plaintiffs.  (Tr. 58.)  Wen Ming Lin saw about ten of these workers at the Factory that day.  (Tr. 65.)  Mr. Lin followed him throughout the

building during this time, holding a phone and restricting his access to the Factory.  (Tr. 64-65.)
He was not permitted to enter the third floor of the building and was not permitted to walk about
unaccompanied.  (Id.)

Plaintiffs Wen Ming Lin and Yu Jiao Lin each testified that losing their jobs at the
Factory caused them to suffer from financial and emotional stress.  Wen Ming Lin relied upon
his job at the Factory to support his wife and two children.  (Tr. 50.)  Yu Jiao Lin has sought
medical treatment from a psychiatrist as a result of these events and the financial strain of being
unemployed.  (Tr. 94.)

### 5.   The Closing of the Factory

Mrs. Lin testified that the decision to close the Factory was made in October 2008, prior
to the initiation of the lawsuit, "[b]ecause there was no business."  (Tr. 174, 219, 256-258.)  She
claimed that she had considered closing the business for at least three months, and discussed the
issue with her husband, her mother, and Fang Zhen.  (Tr. 219, 258.)  Mrs. Lin noted that she
discussed closing the business in early November 2008 when she visited her mother in China.
(Tr. 258.)  The court pressed Mrs. Lin to explain why she waited until the end of December to
close the business if the decision had been made in November.  (Tr. 259-260.)  Mrs. Lin
explained that she wanted to maintain the business until the end of the calendar year, and closed
it on December 31, 2008.  (Tr. 260.)  Despite this purported plan, Mrs. Lin provided no advance
warning to her employees that they would be out of work; she abruptly announced the change on
December 31, 2008, the last day of business.  (Tr. 260.)

Plaintiffs claim that Factory remains in operation, whether under the guise of Silver
Fashion or the auspices of another entity.  They point to testimony that Wen Ming Lin and Yu
Jiao Lin saw the personal belongings of other employees remaining at the Factory on January 5,

17

2009, and that people in one department of the Factory, the sewing department, were hanging clothes up that day.  (Tr. 58, 94, 159.)   Wen Ming Lin further testified that the Defendants closely watched him when he entered the Factory to collect his things and restricted him from walking throughout the space.  (Tr. 64-65.)  He saw "lots of clothing piled up over there in the sewing department," observed other workers on the premises, and concluded that the Factory did not appear to be closed.  (Tr. 66-67.)

Plaintiffs claim that surveillance videos from the Factory on January 6, 2009 reveal people working throughout the Factory.  (Pl. Post-Hearing Mot. 10.)  To the contrary, the videos demonstrate that the once-bustling rooms of the Factory lay mostly abandoned by January 6.  (Compare Def. Ex. B(1) at File 1 (December 18, 2008) to Def. Ex. B(1) at File 8 (January 6, 2009); Def. Ex. B(2) (January 6, 2009).)  The desks are empty and the lights are turned off in the sewing room and other areas where many workers were previously stationed.  (Id.)  The rooms contain many stacks of brown cardboard boxes, but their contents are unknown.  (Def. Ex. B(1) at File 8.)  The available footage depicts only a few persons on the premises on January 6, 2009, handling smaller tasks of sorting items and dismantling tables.  (Id.)  Generally, the video confirms that as of January 6, 2009, the Factory appeared to be closed.

Plaintiffs hired a private investigator, Stephen Davis, to watch the activity surrounding the Factory and ascertain whether work was proceeding there, or if equipment or assets were being removed from the building.  (Tr. 16-17.)  Davis videotaped the site to record his findings. On both January 8 and 9, 2009, Davis observed trailer trucks in front of the building where the Factory was located at or around 3:00 p.m.  (Tr. 17, 19.)  Davis saw approximately 100 boxes loaded on to the trailer on the first day, with the aid of four workers and "two Asian females" who appeared to be "supervising or overseeing the loading process."  (Tr. 17-18, 26-27; Pl. Ex.

18

1.)  On the second day, he saw some individuals conferring outside the truck, but did not witness any materials being loaded on to or removed from the trailer.  (Tr. 20.)  Based upon his experience and observations, he believed that "something may have been unloaded from the truck" prior to his arrival.  (Tr. 20.)  Both days he witnessed roughly 15-20 individuals exiting the building between 6:15 and 6:40 p.m., most of whom he identified as Asian women.  (Tr. 18, 20.)  Davis opined that a business appeared to be operating from the location.  (Tr. 19.) However, this evidence was inadequate to clarify whether the Factory – rather than some other aspect of the Defendants' business – remained open and operating.

Defendant Fang Zhen testified that the Factory closed on December 31, 2008, but that Great Wall remains in operation at the location.[6]  (Tr. 123.)  Fang Zhen testified that she worked on January 9, 2009, and that garments arrived that day from China.  (Tr. 127.)  On January 9, Fang Zhen "was examining the work" and performing "quality control" on the imported garments, and working out of the first floor office.  (Tr. 125-26.)  She claimed that only "Great Wall" people were working that day, but stated she did not to know what kind of work they were doing.  (Tr. 126-127.)  Fang Zhen testified that any manufacturing operations in the building were closed down, and her job was now limited to performing "quality control" on garments imported from China.  (Tr. 133.)

The court attempted to discern whether the role of a "packer" was limited to manufacturing work, or if the same function was performed on imported goods.  As six frustrating pages of testimony demonstrate, it was impossible to elicit an answer to this question from Fang Zhen.  (Tr. 138-144 (testimony of Fang Zhen stating that she opened some imported boxes to examine goods, but alternately claiming that the "workers of Great Wall Corporation"

---

[6] The Defendants' surveillance videos from December 31, 2009 show a reduced number of workers in the Factory, and large piles of clothes on the tables.  (Def. Ex. B(1) at File 7.)  The rooms appear cleared of employees by approximately 6 or 6:30 p.m.  (Id.)

repackaged the boxes and that she did not know how or by whom the boxes were repackaged).)

Mr. Lin insisted that Great Wall did not employ workers to serve as "packers" or "thread cutters"

and that Great Wall's wholesale business had no use for such functions.  (Tr. 161.)  Plaintiffs

failed to elicit facts relevant to this question from their own witnesses, particularly Wen Ming

Lin, the one Packer Plaintiff to take the stand.  Affidavits submitted by the Plaintiffs explained

only that a packer's duty is "to affix labels to articles of clothing and to fold and pack the

clothing."  (See, e.g., Affidavit of Wen Ming Lin, dated January 5, 2009, ¶ 2.)  Absent sufficient

evidence, the court cannot conclude that the current operations of Great Wall utilize "packers"

such as the Plaintiffs.

### III.    STANDING

 Defendants move to dismiss the Complaint for lack of subject matter jurisdiction under

Federal Rule of Civil Procedure 12(b)(1), on the ground that Plaintiffs lack standing pursuant to

the FLSA.  Upon review of a motion to dismiss under Rule 12(b)(1), a district court may

consider evidence outside the pleadings and conduct a hearing to resolve genuine disputes of

material fact.  Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82 (2d Cir.

2006).  Plaintiffs asserting subject-matter jurisdiction bear the burden of proving that it exists by

a preponderance of the evidence.  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

The FLSA defines "employee" broadly as "any individual employed by an employer,"

and to "employ" as "to suffer or permit to work."  29 U.S.C. §§ 203(e)(1), 203(g).  "Employer"

is defined as "any person" other than a labor organization "acting directly or indirectly in the

interest of an employer in relation to an employee."  Id. § 203(d).  The Second Circuit has

adopted an expansive view of the employment relationships covered by the FLSA, recognizing

that the FLSA is a "remedial" statute, purposely "written in the broadest possible terms so that

20

the minimum wage provisions would have the widest possible impact in the national economy."
Carter v. Dutchess Cmty. College, 735 F.2d 8, 12 (2d Cir. 1984).

      In determining whether an employment relationship exists for purposes of the FLSA, courts evaluate the "economic reality" of the relationship, looking beyond rigid corporate constructs to consider the functional realities facing employees.  See Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961).  The Second Circuit has declined to circumscribe this analysis to a precise set of factors, recognizing up to ten common factors while noting that a district court is "free to consider any other factors it deems relevant to its assessment of the economic realities."  Zheng v. Liberty Apparel Co., Inc., 355 F.3d 61, 71-72 (2d Cir. 2003). Since the economic reality test is a "flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances," the Circuit recently clarified that different sets of factors apply to different "factual challenges posed by particular cases."  Barfield v. New York City Health & Hosp. Corp., 537 F.3d 132, 141-42 (2d Cir. 2008).

      In Barfield, the Second Circuit identified three formulations of the economic reality test in its jurisprudence, each of which has some application to the issues raised in this case.  Id. at 143.  Barfield divided these formulations into three separate inquiries: (1) whether workers should be viewed as independent contractors or employees, (2) whether a formal employment relationship existed between the employees and a putative employer, and (3) whether an entity lacking formal control nevertheless could be considered a joint employer due to the "functional control" it exercised over workers.  Id. at 143.

      To distinguish employees from independent contractors, courts focus on:

> (1) the degree of control exercised by the employer over the workers, (2) the
> workers' opportunity for profit or loss and their investment in the business,
> (3) the degree of skill and independent initiative required to perform the
> work, (4) the permanence or duration of the working relationship, and (5)

the extent to which the work is an integral part of the employer's business.

Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988) (citing United States v. Silk, 331 U.S. 704, 716 (1947)).  These factors are not exclusive, and no single factor is dispositive. Id. at 1059.  The heart of the inquiry is whether, "as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."  Brock, 840 F.2d at 1059.

When determining whether a particular defendant served as an "employer" under the FLSA, the inquiry is even broader.  The Second Circuit's decision in Carter v. Dutchess County Community College sets forth four core factors signifying formal control by an employer.  These factors included "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  735 F.2d at 12 & n.3 (internal citations omitted) (recognizing the need for case-by-case analysis because "the statute's definitions are stated only in the broadest terms").

Even in the absence of formal control described by the Carter factors, a defendant may be characterized as an "employer" for FLSA purposes if he or she exercises functional control over the workers in question.  In Zheng v. Liberty Apparel Company, Inc., the Second Circuit recognized six additional factors indicative of functional control:

> (1) whether [a defendant's] premises and equipment were used for the plaintiffs' work;
> (2) whether the [defendants] had a business that could or did shift as a unit from one putative joint employer to another;
> (3) the extent to which plaintiffs performed a discrete line-job that was integral to [defendant's] process of production;
> (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes;
> (5) the degree to which the [defendants] or their agents supervised plaintiffs' work; and

(6) whether plaintiffs worked exclusively or predominantly for the
defendants.

355 F.3d at 72.  In this context as well, the economic reality test does not depend on these or any

other isolated factors, as "any relevant evidence may be examined so as to avoid having the test

confined to a narrow legalistic definition."  Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139

(2d Cir. 1999) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947) (whether an

employer-employee relationship exists depends "upon the circumstances of the whole activity")).

    A.  Defendants' "Independent Contractor" Theory

    Defendants argue that Plaintiffs lack standing to sue because they were not "employees,"

as defined in the FLSA, but rather "independent contractors."  (Def. Post-Hearing Opp. 15-19.)

Defendants claim they "outsourced the packing and trimming work to Wen Ming Lin and Yu

Jiao Lin," and Wen Ming Lin in turn employed a group of "independent contractors," the Packer

Plaintiffs.  (Def. Post-Hearing Opp. 8.)  In support of their view, Defendants assert that they did

not hire, fire, supervise, or manage the workers.  (Def. Post-Hearing Opp. 8-9.)  They claim that

the "subcontractors" maintained the other workers' employment records, negotiated a pay rate

for the group and collected checks on one desk, and that "the plaintiffs themselves decided when

they should arrive, depart, and the amount of time for which they were to work."  (Def. Post-

Hearing Opp. 9.)

    The evidence presented at the Hearing exposed each of these assertions to be patently

false.  Applying the Brock factors, there is simply no question that these Plaintiffs "depend[ed]

upon someone else's business for the opportunity to render service" and were not "in business

for themselves."  See Brock, 840 F.2d at 1059.  The Plaintiffs were low-skilled, immigrant piece-

workers toiling for long hours of manual labor in a garment factory.  At least one, Yu Jiao Lin,

expressed that she was illiterate.  The testimony of the Plaintiffs established that they were

interviewed, hired, fired, assigned work and hours, and supervised and managed by Mrs. Lin and Fang Zhen, or others under their control. (Tr. 31, 33-36, 78-81.)  Contrary to the Defendants' assertions, there is no evidence that Wen Ming Lin or Yu Jiao Lin had the power to hire, fire, manage assignments and schedules, or discipline other workers.  (Id.)

It is plain that Mrs. Lin and Fang Zhen exercised a degree of control over the workers commensurate with the role of an employer.  The Defendants' collective denial of control over the workers is not credible.  Wen Ming Lin's referral of prospective workers to Mrs. Lin for her to interview does not elevate him to the role of independent contractor.  (Tr. 52-53.)  The Defendants' additional arguments are similarly unavailing and unsupported by the evidence.  For example, the Defendants' repeatedly point to a single paycheck issued on December 9, 2005 and marked "payment for the assigned contractors" as evidence that "Plaintiffs shared and shared alike," creating a relationship "best [] characterized as a partnership."  (Def. Post-Hearing Opp. 3, Def. Ex. A.)  The Defendants' choice to unilaterally label the Plaintiffs "contractors," and to attempt to pay them via a collective paycheck on one occasion years ago, does not control the legal question before the court.  This crude argument fails to set the Plaintiffs apart as independent contractors.

Considering the remaining Brock factors, the Defendants' "independent contractor" theory proves even more preposterous.  There is zero evidence that Plaintiffs had any opportunity for profit or loss or an "investment" in the business.  The packers and thread-cutters were engaged in low-skilled factory labor, which was obviously not a matter of "independent initiative."  The Plaintiffs who took the stand worked at the Factory on a permanent, daily basis for three years.  Their work at the Factory was not an occasional project.  The Plaintiffs

performed discrete tasks that assisted the line production, assembly, and packaging of goods.  It is clear that their work was "an integral part of the employer's business."

Defendants' contrived efforts to distance themselves from their workers and treat them as "subcontractors" have failed.  The Defendants' argument is nothing more than a transparent attempt to use a legal fiction to escape liability for their alleged labor abuses.  The notion that these Plaintiffs acted as independent contractors outside the protection of the FLSA is so thoroughly without merit that it borders on an affront to the dignity of this court.[7]

B.  <u>Silver Fashion and Mrs. Lin Constitute "Employers" Under the FLSA</u>

As a matter of economic reality, the Plaintiffs were employed by the Factory and the entities that owned it over the years:  Silver Fashion, Great Rose, and Spring Fashion.  Under the <u>Carter</u> factors, Silver Fashion maintained formal control over the Plaintiffs through the actions of its principal managers.  Since Mrs. Lin's parents were absentee, nominal owners of the business, Mrs. Lin controlled the company.  The persistent euphemism that Mrs. Lin was just "helping out" her parents and that Fang Zhen was "helping" Mrs. Lin cannot be taken seriously.  The only conceded owners or managers of Silver Fashion were Mrs. Lin's parents, who live in China and appear to have no involvement whatsoever in the operations of this company held in their names.  As Mrs. Lin eventually summarized:  "Basically I was running the company."  (Tr. 262.)

---

[7] For example, Defendants go so far as to proclaim that their right to "freedom of contract," protected under the Liberty Clause of the Fourteenth Amendment, has been "seriously interfered with" by this action.  (Def. Post-Hearing Opp. 19 (citing New York state cases from the early 20th century).)  In their infinite audacity, they claim that Plaintiffs "acted in extreme bad faith in filing the instant lawsuit" because they "pocketed the profits" of their labor at the Factory and then "claimed they were employees protected by the labor law."  (<u>Id</u>.)  The Defendants' <u>Lochner</u>-era view of contract and labor rights has been totally discredited by the Supreme Court for more than 70 years.  In a dramatic historical shift, the Court rejected the purported sanctity of "freedom of contract" to protect persons victimized by the very circumstances alleged in this case:  the "exploitation of a class of workers who are in an unequal position with respect to bargaining power and are thus relatively defenseless against the denial of a living wage."  <u>West Coast Hotel v. Parrish</u>, 300 U.S. 379, 399 (1937).  Legislation like the FLSA targets the evils of precisely these "free market" practices endorsed by the Defendants.

As reviewed above, Plaintiffs were interviewed, hired, fired, assigned work and hours, and supervised and managed by Mrs. Lin and Fang Zhen, or others under their control. (Tr. 31, 33-36, 78-81.) There is no serious dispute that Mrs. Lin or others acting on her behalf determined the rate and method of payment. Mrs. Lin also maintained employment records, as demonstrated by the Defendants' production of the Weekly Trim/Packing Reports. (See Def. Ex. A (original records in blue ink).) These records purport to show the quantity and price of the piecework performed by the Packer Plaintiffs, which formed the basis for their weekly compensation.[8] At a minimum, Plaintiffs have standing to sue Silver Fashion, its predecessor entities, and Mrs. Lin under the FLSA. The court reserves judgment pending discovery as to the role of Fang Zhen in the employment scheme.

    C. <u>Great Wall and Mr. Lin May Constitute Joint Employers Under the FLSA</u>

Defendants also argue that the case should be dismissed as to Great Wall and Mr. Lin, because they had no "operational control" over the Plaintiffs. (Def. Post-Hearing Opp. 10-15.) The agency regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the same time. See 29 C.F.R. § 791.2 (2003); <u>Zheng</u>, 355 F.3d at 66 (citing <u>Torres-Lopez v. May</u>, 111 F.3d 633, 639-45 (9th Cir. 1997) (permitting claims against joint employers under the FLSA); <u>Antenor v. D & S Farms</u>, 88 F.3d 925, 929-38 (11th Cir. 1996) (same)). Plaintiffs have standing to sue Great Wall and Mr. Lin, in addition to the other Defendants, if they exercised "functional control" over the Factory and its workers. See <u>Barfield</u>, 537 F.3d at 143; <u>Zheng</u>, 355 F.3d at 66, 72.

---

[8] In the alternative, the court finds that Silver Fashion and Mrs. Lin maintained functional control over the Plaintiffs as measured by the <u>Zheng</u> factors. Silver Fashion's premises and equipment were used for Plaintiffs' work, the Plaintiffs performed a discrete line-job that was integral to Silver Fashion's process of production, Mrs. Lin and her agents supervised Plaintiffs' work, and the Plaintiffs worked exclusively for the Defendants. See <u>Zheng</u>, 355 F.3d at 72. The evidence establishes that, at the very least, Silver Fashion and Mrs. Lin acted with functional control over the Plaintiffs' employment.

Discovery is needed to determine whether a functional employment relationship existed between the Plaintiffs and Great Wall under the Zheng factors.  The economic reality test intentionally reaches beyond traditional concepts of agency law to encompass "working relationships, which prior to [the FLSA], were not deemed to fall within an employer-employee category."  Zheng, 355 F.3d at 69 (quoting Walling v. Portland Terminal Co., 330 U.S. 148, 150-51 (1947)).  Under the theory of functional control, "an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them."  Zheng, 355 F.3d at 70 (interpreting Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947)).  Evidence already establishes that purported agents of Great Wall – Mrs. Lin and Fang Zhen, who each testified that they were employed exclusively by Great Wall – supervised the Plaintiffs' work in the Factory.  The ownership of the premises and the equipment used in the Factory could be imputed to Great Wall, given the tangled leasing relationships between Mr. and Mrs. Lin and the fact that the Factory's space was distinguished from Great Wall's space by nothing more than a pile of paper boxes.  The Second Circuit has also recognized that a company can de facto set employees' wages and "dictate[] the terms and conditions" of their employment, though they do not "literally pay the workers," where those employees perform work exclusively in service of that company.  Id. at 72.  In effect, Plaintiffs functionally worked for Great Wall, because they worked in a Factory that manufactured garments exclusively for Great Wall.  Upon review of the preliminary evidence before the court, the relationship between Plaintiffs and Silver Fashion appears to have had "no substantial, independent economic purpose" beyond serving as a "subterfuge meant to evade the FLSA or other labor laws" for the benefit of Great Wall.  Id.

In light of the court's obligation to look beyond the strictures of formal tests and consider all relevant facts, the court finds that Defendants' dubious uses of the corporate form and the interlocking relationships between the Defendant Corporations are pertinent to the joint employer inquiry in this case. Defendants' attempt to distinguish Great Wall as a mere "customer of Silver Fashion" is a fallacy. Nearly every aspect of these businesses was intertwined. Together, the Lins controlled both companies. Mr. Lin owned Great Wall, and his wife operated Silver Fashion. Mrs. Lin's parents appear to be nothing more than straw owners of Silver Fashion. Great Wall was Silver Fashion's landlord and sole client. Silver Fashion manufactured garments exclusively for Great Wall. In turn, Mr. Lin could not identify a single supplier to his company other than Silver Fashion. Mrs. Lin owned the building where both companies were housed, yet leased the entire building to a company wholly controlled by her husband, so that he could sublet part of it back to her parents for $18,000 a month. (See Section II.A supra.) From the rent and the garment sales, significant funds flowed between these related companies on a regular basis. These entities were functioning as complementary components of a single business enterprise.[9] Based upon these facts, Plaintiffs may have standing to hold Great Wall and Mr. Lin liable either as their functional employers or under other legal theories. The court denies Defendants' Motion to Dismiss for lack of standing in its entirety.

## IV.    INJUNCTIVE RELIEF

The FLSA specifically authorizes courts to grant injunctive relief where a retaliation claim is raised under Section 215(a)(3) of the statute. Section 215(a)(3) makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such

---

[9] Mrs. Lin claimed that Silver Fashion employed approximately 20 people when it was in business, and Mr. Lin stated that Great Wall employs 22 people. (Tr. 218, 165.) None of these employees have been identified by Defendants. The similarity of these numbers in the record suggests the possibility that the two companies may be staffed by the same set of employees.

employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).  Pursuant to Section 216(b), an employer who discharges or otherwise discriminates against an employee who files a complaint under the FLSA is liable for appropriate legal and equitable relief, "including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages."  29 U.S.C. §216(b); see Ward v. Bank of New York, 455 F. Supp. 2d 262 (S.D.N.Y. 2006).

To obtain a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure, the moving party must "show that he will suffer irreparable harm absent injunctive relief and either (1) that he is likely to succeed on the merits of his claim; or (2) that there are sufficiently serious questions going to the merits to make them fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party."  Wright v. Giuliani, 230 F.3d 543, 547 (2d Cir. 2000); Mullins v. City of New York, 307 Fed. Appx. 585, 586 (2d Cir. Jan. 27, 2009) (applying standard to FLSA claim).  This heavy burden reflects the fact that a preliminary injunction "is an extraordinary remedy" which "should not be routinely granted."  Coleman v. Bd. of Educ. of the City of Mt. Vernon, 990 F. Supp. 221, 226 (S.D.N.Y. 1997).

A.  Likelihood of Success on the Merits

The FLSA provides that it is "unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA] . . . ."  29 U.S.C. § 215(a)(3).  The New York Labor Law similarly prohibits employers from

> discharg[ing], penaliz[ing], or in any other manner discriminat[ing]
> against any employee because such employee has made a complaint to

> his employer, or to the commissioner or his authorized representative,
> that the employer has violated any provision of this chapter, or because
> such employee has caused to be instituted a proceeding under or related
> to this chapter, or because such employee has testified or is about to
> testify in an investigation or proceeding under this chapter.

N.Y. Lab. Law § 215(1).  In order to establish a prima facie case of retaliation, a plaintiff must show "(1) participation in protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Lai v. Eastpoint Intern, Inc., No. 99-cv-2095, 2000 WL 1234595, at *3 (S.D.N.Y. Aug. 31, 2000) (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)).  Once a prima facie case is made, a burden-shifting framework applies.  The employer has the opportunity to articulate a nondiscriminatory rationale for the action taken, and the employee may rebut by showing that it is more likely that the adverse action was motivated by discrimination than by the employer's proffered nondiscriminatory rationale.  Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 876 (2d Cir. 1988) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

The participation of the Plaintiffs in this action constitutes a protected activity under the express terms of the FLSA and the New York Labor Law.  29 U.S.C. § 215(a)(3) (protected activities include "fil[ing] any complaint" or "instituting any proceeding . . . related to the [FLSA]"); accord N.Y. Lab. Law § 215(1) (McKinney 2002).  Their participation became known to the Defendants when they were served with the Summons and Complaint on December 18, 2008.  (Docket Entries #2-7, Executed Summons; Tr. 180 (Mr. Lin learned of the lawsuit sometime after December 12, "[a]round the middle of December").)  Defendants filed an appearance in the action on December 24, 2008.  See, e.g., Torres v. Gristedes Operating Corp., No. 04-cv-3316(PAC), 2008 WL 4054417, at *17 n.20 (S.D.N.Y. Aug. 28, 2008) (knowledge of

lawsuit established by defendants' counsel filing appearance).  Adverse actions were taken: Plaintiffs' hours were reduced and they were discharged by December 31, 2008.  (See, e.g., Tr. 47, 92.)  Mrs. Lin and Fang Zhen inappropriately confronted Yu Jiao Lin about the lawsuit and announced to all the workers that Yu Jiao's "heartless" actions would cost them their jobs.  (Tr. 89-90.)

In retaliation cases, a causal connection between the protected activity and the adverse action can be established by either "evidence of retaliatory animus directed against a plaintiff by the defendant" or a close temporal proximity between the protected activity and the adverse employment action.  DeCintio v. Westchester Cty. Medical Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (evaluating causal connection in Title VII retaliation claim).  Both forms of proof are present in this case.

The harassment of Yu Jiao Lin exposed the Defendants' exercise of their retaliatory animus.  This event occurred the very next day after Mrs. Lin was served with the Complaint in this action.  Defendants concede that Mrs. Lin and Fang Zhen met with Yu Jiao Lin on December 16, 2008, but claim that the "purpose of the meeting was simply to inquire into the basis and reason" for the lawsuit.  (Def. Post-Hearing Opp. 23.)  Defendants similarly admit that "Defendants convened the employees of Silver Fashion to announce the lawsuit against it" on December 18, 2008, and to apprise employees of "the potential negative implications arising therefrom."  (Id.)  Viewing the totality of the testimony and the facts, it is obvious that these events were not innocuous.  Defendants' actions were motivated by retaliatory animus and designed to intimidate and threaten the Plaintiffs, as well as other employees.  Their admission that "negative implications" arose as a result of the lawsuit undercuts their claim that Silver Fashion closed for reasons independent from this case.  See Morris v. Lindau, 196 F.3d 102, 110

(2d Cir. 1999) (adverse employment actions include "reprimand," and animus provides direct evidence of retaliation).

The Defendants' retaliation steadily gained momentum, as the Plaintiffs' hours were reduced and they were ultimately terminated less than two weeks after the confrontation with Yu Jiao Lin.  This close temporal proximity raises an inference of retaliatory motives sufficient to establish a causal connection.  See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (causal connection established by temporal proximity where only twelve days elapsed between complaint and discharge); Torres, 2008 WL 4054417 at *18 (deeming 28 day period between protected activity and adverse action to be "very close" in time).

In response to the allegations of retaliatory discharge, Defendants claim that the Plaintiffs were terminated along with all of Silver Fashion's employees, and that these actions were taken because the entire company was dissolved.  They have represented that Silver Fashion closed "[b]ecause there was no business."  (Tr. 174, 219, 256-258.)  They admit that employees were given no advance notice that Silver Fashion was going out of business, and have provided no evidence of any efforts undertaken to unwind the company prior to the commencement of this action.

The fall of 2008 ushered in extraordinary changes in the global economy, destabilizing markets and crushing many businesses.  However, the coincidence of this lawsuit with the toxic economic climate does not provide a blanket excuse for the actions of these Defendants.  No evidence was presented to document any actual decline in profits or other changed economic circumstances facing the Factory.  The only support for this generic theory of worsening business conditions comes from Defendants' own testimony, which was thoroughly and repeatedly discredited at the Hearing.  See Yu G. Ke v. Saigon Grill, 595 F. Supp. 2d 240, 263

(S.D.N.Y. 2008) (rejecting defense that sector of business was closed for financial reasons where there was "not a shred of evidence to support" the claim).

Further, Mrs. Lin admitted that Great Wall was Silver Fashion's only customer, and that Great Wall remains in business. (Tr. 260-61.) To the extent Silver Fashion "lost" business, this was the direct result of the Defendants' decision to decrease or discontinue their manufacturing needs. (Tr. 260.) The survival of one amidst the demise of the other increases the court's suspicion of Defendants' motives in closing the Factory. Defendants' disingenuous representations to the court, frivolous standing arguments, manipulations of the corporate form, and self-righteous invocation of their purported "freedom of contract" further undermine the credibility of their defense.

At this stage of the case, I find that it is unlikely that Defendants' proffered explanation that the Factory closed for neutral business reasons will be proven. The evidence thus far strongly substantiates Plaintiffs' FLSA retaliation claim and demonstrates a high likelihood of success on the merits. At a minimum, "there are sufficiently serious questions going to the merits to make them fair ground for litigation." See Wright, 230 F.3d at 547.

### B. Irreparable Harm

Termination from employment does not necessarily constitute irreparable harm in the Second Circuit, which demands that "truly extraordinary circumstances are shown" to grant injunctive relief in this context. Holt v. Cont'l Group, Inc., 708 F.2d 87, 90-91 (2d Cir. 1983); Absent extraordinary circumstances, "the requisite irreparable harm is not established in employee discharge cases by financial distress or inability to find other employment." Holt, 708 F.2d at 90-91; see Sampson v. Murray, 415 U.S. 61, 89-92 (1974) (injuries such as loss of income, damage to reputation, and difficulty in finding other employment do not rise to the level

33

of irreparable injury).  In rare circumstances, some courts have recognized that "the harm generated by loss of employment extends beyond financial boundaries," affecting access to food, shelter, and other basic necessities that "cannot be adequately remedied by a later award of damages."  Aguilar v. Baine Serv. Sys., Inc., 538 F. Supp. 581, 584 (S.D.N.Y. 1982) (internal citations omitted).  In Aguilar, the plaintiffs faced severe consequences as a result of their termination, including "eviction, cut-off of their utilities and the inability to provide for their children."  Id.  Later cases emphasize that this standard of irreparable harm is extremely difficult to meet.  See, e.g., Cooney v. Consol. Edison Co., Inc., No. 03-CV-0869 (KMW)(GWG), 2003 WL 22093483, at *3 (S.D.N.Y. Sept. 10, 2003).

The Holt Court found that irreparable injury may exist in retaliatory discharge cases under a different theory.  Holt held that where "[a] retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony for the plaintiff in her effort to protect her own rights," irreparable injury may be threatened.  Id. at 91.  However, the court stopped short of finding "irreparable injury sufficient to warrant a preliminary injunction in every retaliation case."  Id.  Since Holt, the Second Circuit has indicated that irreparable harm may be found where there is specific evidence of a deterrent effect on the exercise of workers' rights.  See Moore v. Consol. Edison Co., Inc, 409 F.3d 506, 511-12 (2d Cir. 2005) (upholding denial of preliminary injunction where there was no evidence of witness intimidation or other chilling effects); see also Stewart v. INS, 762 F.2d 193, 200 (2d Cir. 1985) (reversing grant of preliminary injunction and describing the relevant question as "whether in the particular circumstances therein, the risk of irreparable harm existed as the result of a potential chilling effect.").

Plaintiffs' counsel presented some evidence to show a threat of irreparable injury due to loss of income.  Plaintiffs Wen Ming Lin and Yu Jiao Lin testified that their termination caused them financial and emotional stress, and Wen Ming Lin expressed that he relied upon his job at the Factory to support his wife and two children.  (Tr. 50, 93.)  Each of the Plaintiffs submitted an affidavit in support of the motion, repeating an incantation at the end that stated:

> "My subsistence depends upon my income from the Factory.  If I am
> unable to return to work, I will no longer make a livable income."

(See, e.g., Affidavit of Wen Ming Lin, dated January 5, 2009, ¶ 21; Affidavit of Pin Yun Zhang, dated January 5, 2009, ¶ 19; Affidavit of Ai Yi Lin, dated January 5, 2009, ¶ 19.)  Plaintiffs Hui Lin and Huang Chen, a married couple, added that they would be unable to provide for their children and extended family without their jobs.  (Affidavit of Hui Lin, dated January 5, 2009, ¶ 21; Affidavit of Huang Chen, dated January 5, 2009, ¶ 17.)

This evidence supports the Plaintiffs' claim of irreparable injury, but does not provide sufficient detail to establish the "extraordinary circumstances" required by Circuit precedent.[10] See Stewart, 762 F.2d at 200 (plaintiff's declaration that he could not adequately provide for his family deemed insufficient to demonstrate irreparable harm).  Since Aguilar, district courts have generally refused to grant preliminary relief on a theory of financial distress.  See, e.g., Cooney, 2003 WL 22093483, at *3-4 (finding no evidence of irreparable harm where plaintiff stated he was left "unemployed with loss of medical benefits and loss of wages").  Judges in this District have held that:

---

[10] Defendants concede that the Plaintiffs worked as much as twelve hours a day, for six to seven days a week.  (Def. Post-Hearing Opp. 26.)  Defendants rely upon this fact to argue that "these staggering numbers" prove Plaintiffs "earned enough money to carry them through a period of unemployment."  (Id.)  This perverse argument is devoid of any merit.  This suit commenced precisely because Plaintiffs allege they were illegally deprived of a minimum wage and compensation commensurate with the hours they worked.

> Irreparable injury along these lines can only be established by a clear demonstration that the plaintiff (1) has little chance of securing future employment; (2) has no personal or family resources; (3) has no private unemployment insurance; (4) is unable to finance a loan privately; (5) is ineligible for public assistance; and (6) there are [] other compelling circumstances weighing heavily in favor of interim relief.

Shady v. Tyson, 5 F. Supp. 2d 102, 109 (E.D.N.Y. 1998).  "In essence, the plaintiff must quite literally find [himself] being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm."  Williams v. State Univ. of N.Y., 635 F.Supp. 1243, 1248 (E.D.N.Y. 1986).  Plaintiffs are low-wage workers with limited skills.  The court recognizes the grave possibility that the present circumstances have forced Plaintiffs and their families to the precipice of a decent standard of living.  However, the court is limited to the record put before it by the parties.  There is no evidence regarding the Plaintiffs' opportunities for alternate employment, and little information regarding personal resources.  Plaintiffs' testimony and affidavits relied on conclusory statements.  The evidence advanced by the Plaintiffs fails to satisfy the high standard established by the case law on financial distress.

Similarly, the record cannot support a determination at this time that Defendants' retaliatory actions have caused irreparable harm by chilling the exercise of worker rights.  While "[u]nchecked retaliation . . . subverts the purpose of the FLSA" and "the resulting weakened enforcement of federal law can itself be irreparable harm in the context of a preliminary injunction application," the Second Circuit has held that a plaintiff "must show some evidence of actual chill that would be cured by the requested injunction."  Centeno-Bernuy v. Perry, 302 F. Supp. 2d 128, 135 (W.D.N.Y. 2003); Bennett v. Lucier, 239 Fed. Appx. 639, 640 (2d Cir. July 5, 2007) (denying reinstatement where co-worker testified in spite of alleged chilling effect); see Holt, 708 F.2d at 89.

The overt retaliatory actions taken in this case pose serious dangers.  Prior to dismissing the Plaintiffs and closing the Factory, Mrs. Lin interrupted work at the Factory to announce that Yu Jiao Lin and the other Plaintiffs had filed a lawsuit against her.  (Tr. 89.)  Mrs. Lin told the staff that anyone without legal immigration status would be eliminated, and that they would be losing their jobs as a result of Yu Jiao Lin's complaint.  (Tr. 90.)  The Defendants' display of Yu Jiao Lin was intended to set an example, to discourage other workers from exercising their rights, and to instigate hostility towards Yu Jiao Lin in order to deter cooperation among the workers.  Their strategy succeeded:  the other workers blamed Yu Jiao Lin for costing them their jobs and turned on her.  (Tr. 90.)  Here, "the distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony for the plaintiff in her effort to protect her own rights" is poised to become a reality.  Holt, 708 F.2d at 91.

This incident raises the specter of witness intimidation, but does not rise to the level of "actual chill" mandated by Second Circuit jurisprudence.  Yu Jiao Lin testified at the Hearing.  Plaintiffs have not identified any potential witnesses, beyond the Plaintiffs, among the Factory workers, nor have they described any efforts to identify other workers or contact them for assistance in this litigation.  To support their theory of irreparable harm, Plaintiffs rely heavily upon Centeno-Bernuy, a fellow district court case, but the circumstances are easily distinguishable.  In that case, there was abundant evidence of "actual chill."  See id., 302 F. Supp. 2d at 133.  Three of the four plaintiffs submitted affidavits declaring that they were unwilling to appear in court due to their fears of retaliation.  Id.  At least one witness, appearing upon subpoena by the plaintiffs, testified that she no longer wished to serve as a witness because she had suffered retaliation for her role and feared continued threats.  Id.  In the present case, Plaintiffs have offered no clear evidence of this nature.

Though the Plaintiffs have not met the high standard set by the case law, the court remains extremely troubled by the potential consequences of the Defendants' actions. The Defendants' power to purge the Plaintiffs from their staff threatened the entire workforce by example. Following the vilification and dismissal of the Plaintiffs, other Factory employees may be unlikely to come forward with their own experiences. To the extent operations at the Factory continue or are soon revived, the retaliatory discharge of the Plaintiffs will strengthen the ability of the Defendants to compel obedience from remaining workers by forcing them to accept the allegedly illegal compensation terms set by Defendants. Such actions would eviscerate the FLSA, rendering its pledge of protection meaningless. Should Defendants succeed in silencing any remaining workers, the ability of the court to enforce the FLSA against these Defendants will be severely impaired. Evidence of any continuing FLSA violations would be effectively suppressed. The testimony of other workers may be important to evaluate the Defendants' assertions that the entire Factory staff was terminated for business reasons, and that the Factory is completely closed, among other questions related to Plaintiffs' wage and hour claims. Money damages offer little protection from these dangers. The court expects that Plaintiffs will vigilantly monitor these issues, and approach the court in the event that any concerns of witness intimidation or other chilling effects materialize.

### C. Balance of Hardships

Even assuming irreparable harm could be shown, however, the court's findings would not be enough to support the specific remedy that Plaintiffs request. Plaintiffs seek reinstatement to their former employment. Even if Defendants have strategically shuttered the Factory in order to evade the law, the injunctive power of this court is constrained by practical reality. I cannot force a closed business to reopen. I cannot reinstate the Plaintiffs to jobs that no longer exist.

Plaintiffs have provided no legal authority to support the award of such drastic remedies.  The Defendants' own testimony has left many of their litigation positions widely discredited, but the court is persuaded by the video evidence that the Factory was closed at the subject location prior to the Hearing.[11]  Whether the Factory was closed as a result of legitimate business considerations, or due to more pernicious reasons, some degree of pragmatism must govern. Plaintiffs have failed to prove that Defendants are operating the Factory, or any business that could employ these workers in a role similar to their former positions.  Without such evidence, the extraordinary remedy of a preliminary injunction requiring reinstatement is rendered truly unreasonable.  For these prudential reasons, Plaintiffs' Motion for a Preliminary Injunction is denied.

Plaintiffs allege that even if the Factory is no longer in operation, Defendants are engaged in a pattern and practice of closing businesses in order to evade regulation and legal scrutiny.  As part of this pattern, Defendants simply dissolve one corporate entity and reopen an identical business under a new name.  The court shares Plaintiffs' suspicions.  Silver Fashion was created only six months before the Defendants closed it.  (Tr. 241-47.)  Silver Fashion was simply the latest name emblazoned on the Factory, the nominal successor to at least two prior entities operating the exact same business.  (Id.)  Over three years, the title of the corporation that owned the Factory changed three times.  (Id.)  Nothing changed but the name.  Over the past sixteen years, Mr. Lin has opened and closed a multitude of companies.  (Tr. 194.)  In each case, Mr. Lin served as the sole owner and operator of the entity.  (Tr. 194.)  Every one of the companies listed the 36th Street Building as its place of business.  (Tr. 195.)  Mr. Lin claimed he could not recall

---

[11] Testimony revealed that Great Wall has operated factories in other locations over the years.  Fang Zhen has worked at other factories owned by Great Wall over the years; at one point, the company owned "six to seven factories."  (Tr. 104.)  The locations of these factories, or any other means of identifying them, could not be ascertained at the Hearing due to the evasive testimony of the Defendants.  The unsettled record leaves the court to wonder whether the Factory was simply moved to another location as a ploy to evade this lawsuit.

the names of these companies but conceded there were at least four or five.  (Tr. 195.)  He

further explained that he currently runs only one company, but that he uses "many different

names" because he "use[s] different names to deal with different retailers."  (Tr. 195.)  He

claimed that this was standard industry practice.  (Tr. 195-196.)

 While this pattern suggests that the Defendants' future behavior may very well contradict

their present position, it does not change the court's factual conclusion that reinstatement cannot

be granted because the Factory is closed.  The court concludes that, although the remedy of

reinstatement would exceed the prudent exercise of its powers under the present circumstances, it

is not condemned to inaction.  See Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66

(2d Cir. 2007) ("The district court has wide discretion in determining whether to grant a

preliminary injunction . . . ."); Chao v. Ladies Apparel Group, Ltd., No. 01-CV-10724 (JGK),

2002 WL 1217194, at *3 (S.D.N.Y. June 5, 2002) (when deciding whether to grant an injunction

under the FLSA, "the district court may consider the defendant's previous conduct and the

dependability of his promises of future compliance.") (internal quotations omitted).

 The court ORDERS Defendants to notify Plaintiffs and the court immediately as to

whether any Defendant has participated in the creation of a new corporation, as an owner,

officer, or supervisor, since the commencement of this litigation.  This obligation shall remain in

effect until the resolution of the case.  Should discovery reveal that the Factory is in operation, at

the subject location or elsewhere, or that Defendants maintain any other business operation with

substantially similar positions available to those held by the Plaintiffs, the court may consider a

renewed application for injunctive relief.[12]

---

[12] To the extent Plaintiffs seek an order requiring Defendants to set aside potential damages in an escrow account
pending the outcome of the litigation, the court finds that Plaintiffs have failed to carry their burden to demonstrate
the propriety of such relief.  (Pl. Post-Hearing Opp. 24.)  Plaintiffs set forth no law or facts to support the award of
this remedy under the present circumstances, let alone any means of determining an appropriate amount of funds to

## V.        CONCLUSION

Defendants' Motion to Dismiss the action for lack of standing is DENIED.  Plaintiffs'

Motion for a Preliminary Injunction seeking reinstatement is also DENIED.  Defendants are

required to provide notice of changes to their business activities as directed in this Memorandum

and Order.  Should Plaintiffs find that another form of relief is justified to preserve their rights,

they may make an appropriate application to the court.  Because the court concludes that the

Factory was closed prior to the issuance of the TRO on January 7, 2009, its mandate prohibiting

the Defendants from closing or suspending the operations of the Factory is moot.  The TRO is

lifted.


SO ORDERED.

                                                                    s/ Nicholas G. Garaufis
                                                                    NICHOLAS G. GARAUFIS
Dated: Brooklyn, New York                                           United States District Judge
June 2, 2009

---

be set aside.  No evidence has been offered to show that Defendants have sought to fraudulently conceal assets.
Absent any authority in support of Plaintiffs' request, the court declines to order the requested relief.